STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. THOMAS FULLER, A/K/A ANDREW J. DE BRACEY, GREGORY LOYER, AND MICHAEL TRAPP, A/K/A ROBERT W. JORDAN, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 6, 1988—Decided February 24, 1989.

Before Judges PRESSLER, O'BRIEN and SCALERA.

*A. Peter DeMarco*, Assistant Prosecutor, argued the cause for appellant (*Nicholas L. Bissell, Jr.*, Somerset County Prosecutor, attorney; *A. Peter DeMarco*, on the letter brief).

*Mordecai Garelick*, Assistant Deputy Public Defender, argued the cause for respondent *Michael Trapp* (*Alfred A. Slocum*, Public Defender of New Jersey, attorney; *Mordecai Garelick*, of counsel and on the letter brief).

*Richard K. Hurley, Jr.*, attorney for respondent *Thomas Fuller* filed a letter joining the brief and arguments of counsel for *Michael Trapp*.

*Neill Q. Hamilton*, Assistant Deputy Public Defender, filed a letter joining the brief and arguments of counsel for *Michael Trapp* (*Alfred A. Slocum*, Public Defender of New Jersey, attorney for respondent *Gregory Loyer*).

The opinion of the court was delivered by

O'BRIEN, J.A.D.

By leave granted, the State appeals from an order suppressing an oral statement given by defendant Michael Trapp,[1] also known as Robert W. Jordan (Trapp). We reverse.

On January 29, 1988, Lt. Robert Gazaway (Gazaway) of the Hillsboro Township Police Department was investigating an armed robbery, burglary and kidnapping which occurred on January 25, 1988 in Hillsboro. On January 28, Gazaway participated in the arrest of defendant Trap in New York City. While walking to the Fifth Precinct, Trapp told Gazaway that he had a knife in his back pocket which was later identified as belonging to the victim of the charged crimes.[2] When they arrived at the

---

[1] Although defendants Thomas Fuller and Gregory Loyer join in the briefs and argument of defendant Trapp, no argument has been addressed to any statement except the oral statement of Trapp with which we deal in this opinion.

[2] This statement was ruled admissible.

precinct, Gazaway administered *Miranda* [3] warnings to Trapp which Trapp acknowledged he understood. In response to Gazaway's question whether Trapp wished to talk to him, Trapp said he did not. Approximately one minute later, however, Trapp said to Gazaway, "How did you find out where I would be?" or words to that effect. Trapp also asked what happened to "the other guy" [4] and stated he was willing to talk to Gazaway as long as he did not have to implicate anyone else. The officer testified to the prestatement events as follows:

Q. All right. Now, after you read those rights to him, did you continue to speak with him?

A. No, I didn't. For—for approximately a minute I did not talk to him. I was taking care of some other stuff in the room. And then he said to me, 'How did you find out where I would be?' [or] words to that effect. And he also asked me what happened to the other guy. I explained to him that since he told me he didn't want to talk to me, I could not answer any question or talk about the incident.

Q. Did you tell him that you couldn't speak with him unless he voluntarily waived his rights?

A. Yes. Reading from my report I told him, I advised Mr. Trapp that since he had originally told me he did not want to discuss anything with me, I could not talk to him in regard to this investigation unless he voluntarily requested that I talk to him. He stated that he was willing to talk to me about his part in the robberies as long as he was not forced to implicate anyone else involved. He told me he was facing many years in prison anyway so he did not care about talking about what he did during the robberies.

I then went into the adjoining office and asked Detective Agans to come into the room with me and Mr. Trapp. I then advised Detective Agans in the presence of Mr. Trapp that I had originally advised Michael Trapp of his constitutional rights, and that he acknowledged that he understood his rights, but did not want to talk to me about the crimes under investigation. A minute or two later he then voluntarily requested to talk to me as long as I did not make him implicate any other people who may have been involved in the robberies with him.

Mr. Trapp then confirmed to Detective Agans that this was correct and that he did wish to talk to me at this time. And Detective Agans then left the room.

---

[3] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694, rehearing den. *California v. Stewart,* 385 *U.S.* 890, 87 *S.Ct.* 11, 17 *L.Ed.*2d 121 (1966).

[4] These statements were also ruled admissible.

Q. Now, after Detective Agans left the room did you question this defendant Michael Trapp about his involvement in the Hillsboro armed robbery, burglary kidnapping?

A. Yes I did.

It was the oral statement which followed that was suppressed.

After a *Miranda* hearing at which Gazaway testified, the motion judge called the attention of counsel to *State v. Hartley*, 103 *N.J.* 252 (1986). On the following day the judge heard full oral argument and on October 28, 1988 prepared a written opinion. In the opening paragraph of his opinion, the judge said:

Because this court finds beyond a reasonable doubt that Mr. Trapp knowingly, intelligently and voluntarily waived the right to remain silent, his motion raises the issue of whether there is an exception to the holding in *Hartley* where the defendant resumes communications with the police after having first asserted the right to remain silent.

The judge then concluded:

The State argues that by resuming communications with the police, the defendant waived the previously asserted right to remain silent. That is not the issue. The issue is whether the State 'scrupulously honored' the defendant's previously asserted right to remain silent which is a distinct concept from the issue of waiver. *State v. Hartley*, 103 *N.J.* 252, 261 (1986). Before this court can even consider the waiver issue, it must first determine whether the 'scrupulously honored' requirement enunciated by the United States Supreme Court in *Michigan v. Mosley*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975) was satisfied. In *Hartley* our Supreme Court held that the 'scrupulously honored' requirement is not satisfied unless fresh *Miranda* warnings are given to the suspect. *Hartley*, 103 *N.J.* at 256 and 278–279. The court created a bright-line, inflexible requirement that fresh *Miranda* must be given after a suspect has asserted the right to remain silent in order to satisfy the 'scrupulously honored' requirement. *Hartley*, 103 *N.J.* at 267–268. Although *Hartley* involved a situation in which the police resumed communications with the defendant, there is absolutely nothing in *Hartley* to suggest that the 'scrupulously honored' requirement could be met in any other way than by given [*sic*] fresh *Miranda* warnings even in a situation where the defendant resumes communications with the police.

The State also argues that this court should apply the two-step analysis of *Oregon v. Bradshaw*, 462 *U.S.* 1039, 103 *U.S.* [*sic*] 2830, 77 *L.Ed.*2d 405, 33 *CrL* 3211 (1983), on remand 66 *Or.App.* 585, 674 *P.*2d 1190 (Oregon Ct. of Appeals 1984), review denied 296 *Or.* 712, 678 *P.*2d 740 (1984), to reach the waiver issue. In *Oregon v. Bradshaw, Ibid.*, the United States Supreme Court held that there is a two-step analysis to determine whether a confession made by a suspect who had previously invoked the right to counsel is admissible. First, is the issue of whether the suspect 'initiated' further communication with

the police. If the suspect 'initiated' such further communication, then the analysis proceeds to the second step which is to determine whether there was a waiver of the previously asserted right to counsel under the 'totality of the circumstances' test. This court rejects the State's argument because the two-step analysis of *Oregon v. Bradshaw, Ibid.*, is not applicable to the 'right to silence' cases. The test used in 'right to counsel' cases is different from the test used in 'right to silence' cases. *Hartley*, 103 *N.J.* at 277.

Accordingly, the defendant's confession given to Lt. Gazaway after the defendant had asserted his right to remain silent is not admissible.

 Thus, the issue is clearly presented whether the failure of Gazaway to readminister *Miranda* warnings to Trapp, after defendant initiated conversation with Gazaway and before Gazaway questioned Trapp about the offenses, is a per se failure to "scrupulously honor" Trapp's right to remain silent. We agree with the trial judge that the broad language in *State v. Hartley* is capable of the construction he placed upon it. For example, the Court said:

We need go no further today, in respect of *Mosley's* impact on this case, than declare as indispensable to a permissible resumption of custodial interrogation of a previously warned suspect the furnishing of fresh *Miranda* warnings. Unless the police follow this 'bright-line' inflexible, minimum requirement, a defendant's statement made in the above stated circumstances cannot be admitted into evidence as part of the prosecution's case-in-chief. [103 *N.J.* at 267]

Notwithstanding that broad language, the Court had expressed its holding at the outset of its opinion:

We hold that before an accused's previously-asserted right to remain silent may be deemed to have been 'scrupulously honored,' law enforcement authorities must, at a minimum readminister the *Miranda* warnings. In the absence of those renewed warnings any inculpatory statement given in response to *police initiated* custodial interrogation after the right to silence has been invoked is inadmissible. [Emphasis supplied.] [103 *N.J.* at 256]

The State argues that the language "police initiated custodial interrogation" is the limitation upon the rule which is applicable to this case. We agree.

We agree with the trial judge that there is no question that *State v. Hartley* established a bright-line test that once a person in custody exercises his Fifth Amendment right to remain silent after having been given his *Miranda* warnings, his right has not been "scrupulously honored" unless, at a

minimum, new *Miranda* warnings are given to him before he is interrogated. However, the question presented by this case is whether this minimum requirement of the bright-line rule applies when the further questioning is initiated by defendant and not by the police. In the *Hartley* case, it was the police who initiated the questioning without readministering *Miranda* warnings. Notwithstanding the broad language of the opinion, the holding of the Court, as expressed in the third paragraph of its opinion, limits the application of the bright-line rule to "police initiated" custodial interrogation.[5] We conclude that the rule established in *Hartley* is limited by its facts and expressed holding to those cases of "police initiated custodial interrogation." In this case, it was the defendant who initiated further conversation with Gazaway which led to the further interrogation with the resulting oral statement.

In *Oregon v. Bradshaw*, 462 *U.S.* 1039, 103 *S.Ct.* 2830, 77 *L.Ed.*2d 405 (1983), the United States Supreme Court dealt with the question of whether the accused "initiated" further conversation. There, the Court said:

> There can be no doubt in this case that in asking 'Well, what is going to happen to me now?' respondent 'initiated' further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*. [462 *U.S.* at 1045, 103 *S.Ct.* at 2835, 77 *L.Ed.*2d at 412]

---

[5]Custodial interrogation is defined in *Miranda* as "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706. [Emphasis supplied.]

In his concurring opinion in *Oregon v. Bradshaw,* Justice Powell noted that the Court had left the meaning of the word "initiation" ambiguous in *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880 68 *L.Ed.*2d 378, rehearing den. 452 *U.S.* 973, 101 *S.Ct.* 3128, 69 *L.Ed.*2d 984 (1981). He then observed that the majority opinion in *Oregon v. Bradshaw* would require only that the suspect "evinc[e] a willingness and a desire for a generalized discussion about the investigation," whereas Justice Marshall for the dissent would require not only that the accused initiate further communication, but also that the communication be "about the subject matter of the criminal investigation." [Emphasis deleted.] Applying either of these tests to this case, there is no doubt that the questions asked by defendant were about the subject matter of the criminal investigation. Thus, it can fairly be said that defendant "initiated" the further conversation about the subject matter of the criminal investigation.

In rejecting the State's argument that defendant "initiated" further conversation, the motion judge concluded that the two-step analysis of *Oregon v. Bradshaw, supra,*

> is not applicable 'to the right to silence' cases. The test used in the right to counsel cases is different from the test used in the right to silence cases.

In support of this statement, the judge cited *Hartley,* 103 *N.J.* at 277. It is true that the *Hartley* court in Section IV of its opinion, where it was dealing with the consequences that flow from the failure to scrupulously honor a defendant's previously asserted right to silence, said:

> True, there is a difference in the tests to determine when the asserted right has been honored—under *Edwards* and *Jackson,* once the accused requests counsel, there can be no interrogation, absent initiation by the accused, in the absence of counsel, whereas under our holding today, and our reading of *Mosley,* the minimum requirement for the scrupulous honoring of a suspect's previously invoked right to silence is the readministering of the *Miranda* warnings. [103 *N.J.* at 277]

However, immediately preceding the quoted statement, the Court had also said:

> Although both *Edwards* and *Jackson* are 'right to counsel' rather than 'right to silence' cases, in the mold of *Mosley* and the case before us, we are satisfied

that the principles of the cases are readily transferable—that is, a failure scrupulously to honor an asserted right to silence is as much a constitutional violation as is a failure to honor a previously invoked . right to counsel.

We observe that in both the right to counsel cases and the right to silence cases, the determination to be made by the court is whether the defendant's Fifth Amendment right to remain silent has been violated since his Sixth Amendment right to counsel does not attach until after the first formal charging proceeding. *See Moran v. Burbine,* 475 *U.S.* 412, 428, 106 *S.Ct.* 1135, 1145, 89 *L.Ed.*2d 410, 425 (1986). *See Michigan v. Jackson,* 475 *U.S.* 625, 631–632, 106 *S.Ct.* 1404, 1408–1409, 89 *L.Ed.*2d 631, 639–640 (1986) (police initiated interrogation after request for counsel is made at arraignment is a violation of defendant's Sixth Amendment right). Thus the *Hartley* court has said the principles are readily transferable between "right to counsel" cases and "right to silence" cases since in the final analysis both are dealing with the Fifth Amendment right to remain silent.

Once Trapp said he did not want to talk with Gazaway, the police, in our opinion, scrupulously honored that decision. Yet, within one or two minutes, it was Trapp himself who initiated the discussion about the subject matter of the criminal investigation. In still scrupulously honoring Trapp's right to remain silent, Gazaway told him he could not answer any questions or talk about the incident because Trapp said he didn't want to talk to him. The officer told Trapp he couldn't speak with him unless he voluntarily waived his rights.[6] It seems to us that suppression of this statement under these circumstances as a violation of the bright-line rule of *Hartley,* leads to the "absurd and unintended results" referred to by

---

[6]We recognize that Trapp only wanted to know how the police found him and what happened to his cohorts. However, this does not detract from the conclusion that Trapp initiated a communication about the subject matter of the criminal investigation.

Justice Stewart in *Michigan v. Mosley,* 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975), where the Court said:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of the opportunity to make informed and intelligent assessments of their interests. [423 *U.S.* at 102, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 320]

Logically, if upon completion of the *Miranda* warnings and an acknowledgment by defendant that he understood those warnings, Trapp had stated that he wanted to speak to the officer as long as he did not have to implicate other persons, there would be no violation of *Miranda* and *Mosley.* However, the one or two minute interval between Trapp's statement that he did not wish to talk with Gazaway and the initiation by him of further conversation about the incident was tantamount to a decision by him to talk on condition that he did not have to involve anyone else. "Not every break in questioning compels renewed administration of the *Miranda* warnings. Otherwise, police would be obliged to administer those warnings each time a defendant requested or was offered something to eat or drink, the use of toilet facilities, the opportunity to stand and stretch or as here time to lie down." *State v. Bey, II,* 112 *N.J.* 123, 138–139 (1988). In that case, the defendant communicated his desire to spend some time thinking about the events that were the subject of the interrogation. The Supreme Court decided this was not a statement by defendant that he wished to remain silent, although in this case we do have such an affirmative statement. Nonetheless, the one or two minute interval here simply reflects that defendant had thought over his refusal, as did defendant in the *Bey* case.

We cannot conceive that our Supreme Court intended in *Hartley* to require, under the circumstances presented in this case, that Gazaway go through the ritual of restating the

*Miranda* warnings to Trapp before talking with him, although we do recognize that the broad language of its opinion is capable of that construction as concluded by a very capable criminal trial judge.

There is an additional circumstance in this case that we believe lends support for our conclusion. Gazaway testified as to what he did after Trapp indicated his willingness to talk to Gazaway about his part in the robberies as long as he was not forced to implicate anyone else involved. He said:

> I then went into the adjoining office and asked Detective Agans to come into the room with me and Mr. Trapp. I then advised Detective Agans in the presence of Mr. Trapp that I had originally advised Michael Trapp of his constitutional rights, and that he acknowledged that he understood his rights, but did not want to talk to me about the crimes under investigation. A minute or two later he then voluntarily requested to talk to me as long as I did not make him implicate any other people who may have been involved in the robberies with him.

> Mr. Trapp then confirmed to Detective Agans that this was correct and that he did wish to talk to me at this time. And Detective Agans then left the room.

Was this tantamount to readvising defendant of his *Miranda* rights? This issue was suggested by Justice Stein in his dissenting opinion in *Hartley*. However, the majority disagreed that a reminder or reacknowledgment is as effective a means of satisfying *Mosley's* "scrupulously honored" requirement as is the bright-line rewarning requirement of *Hartley*. The majority opinion stated:

> The weakness of such an approach and the merits of a bright-line rule are highlighted by this very case. While the Court views Frieberg's statement as clearly coercive (see discussion infra at 267–271), Justice Stein views the same statement as a non-coercive request to reconsider a previous invocation of the right to silence, fully consistent with a scrupulous honoring of that right. A bright-line rule will help avoid this confusion and conflict in future cases, at least on the question of the *minimum* requirement for scrupulously honoring. [Emphasis in original.] [103 *N.J.* at 267–268]

In his concurring opinion, Justice Handler said about this suggestion:

> I join the majority in differing from Justice Stein's dissenting view that a simple reminder or reacknowledgment of an accused's right to remain silent is sufficient to preserve the scrupulously honored requirement. A bright-line rule that

calls for the readministration of *Miranda* warnings will not only more effica-
ciously secure the right to remain silent, it will serve to avoid the confusion and
conflict in future cases, *ante* at 268 inherent in attempting to characterize a
statement by law enforcement authorities subsequent to an invocation of the
right to remain silent. [103 *N.J.* at 290]

Justice Stein's dissenting opinion is persuasive as to the dan-
gers of the bright-line rule and appears to be supported by
Justice Francis' observation in *State v. Magee*, 52 *N.J.* 352
(1968), *cert.* den. *Magee v. New Jersey*, 393 *U.S.* 1097, 89 *S.Ct.*
891, 21 *L.Ed.*2d 789 (1969), where he quoted from *People v.
Hill*, 39 *Ill.*2d 125, 132, 233 *N.E.*2d 367, 371, *cert.* den. *Hill v.
Illinois*, 392 *U.S.* 936, 88 *S.Ct.* 2305, 20 *L.Ed.*2d 1394 (1968):

To adopt an automatic second-warning system would be to add a perfunctory
ritual to police procedures rather than providing the meaningful set of proce-
dural safeguards envisioned by *Miranda.* [52 *N.J.* at 374]

However, the majority of the Court has expressly disavowed
that position and Justice Stein's conclusion that such a ritual
will not "scrupulously honor" a suspect's *Miranda* rights but
will breed disrespect for them. We are bound by the principles
of law developed and declared by our Supreme Court. *Namm
v. Charles E. Frosst & Co.*, 178 *N.J.Super.* 19, 35 (App.Div.
1981).

Thus, although the Supreme Court would probably not find
the statements made by Gazaway to Agans, in the presence of
and confirmed by defendant, sufficient by themselves to satisfy
the bright-line rule, that circumstance, together with the fact
that defendant initiated the subsequent conversation, leads us
to conclude that defendant's assertion of his right to remain
silent was "scrupulously honored." The oral statement was not
obtained in violation of defendant's Fifth Amendment right to
remain silent, which the motion judge found beyond a reason-
able doubt he had knowingly, intelligently and voluntarily
waived. It should therefore be received into evidence.

The order suppressing the statement is reversed and the
matter remanded for trial.